**IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **JEREMY A. RICHARDSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 3:09-0092** |
| **v.** | ) | **Judge Nixon** |
| | ) | **Magistrate Judge Bryant** |
| **ROCK CITY MECHANICAL** | ) | |
| **COMPANY, LLC** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**ORDER**</u>

Pending before the Court is Defendant Rock City Mechanical Company, LLC's ("Defendant") Motion for Summary Judgment ("Defendant's Motion") (Doc. No. 59), accompanied by a Memorandum in Support (Doc. No. 64) and Statement of Undisputed Material Facts (Doc. No. 60). Plaintiff Jeremy A. Richardson ("Plaintiff") filed a Response to the Motion for Summary Judgment (Doc. No. 77), accompanied by a Memorandum in Support (Doc. No. 78), Response to Defendant's Statement of Undisputed Facts (Doc. No. 79), and a Motion to Allow Late-Filed Documents (Doc. No. 81). Defendant subsequently filed a Reply to Plaintiff's Response (Doc. No. 83),[1] as well as an Updated Statement of Undisputed Material Facts (Doc. No. 85).

For the reasons discussed below, Plaintiff's Motion to Allow Late-Filed Documents is **GRANTED**, and Defendant's Motion for Summary Judgment is **GRANTED**.

---

[1] Defendant neglected to obtain leave of Court to file its Reply, as required by Local Rule 7.01. However, Plaintiff declined to object. Consequently, the Court will consider Defendant's Reply when ruling on Defendant's Motion for Summary Judgment.

Case 3:09-cv-00092   Document 110   Filed 06/28/10   Page 1 of 26 PageID #: 2606

## I.  BACKGROUND

### A.  Factual Background

Jeremy A. Richardson ("Plaintiff") is a White male, born in the United States.  (Doc. No. 1, at 1-2; Doc. No. 78, at 5.)  Plaintiff was hired by Scott Shiner, the Superintendent of Rock City Mechanical Company, LLC ("Defendant") in March 2007 (Doc. No. 64, at 3; Doc. No. 79, at 6), and began working for Defendant on or about March 20, 2007, as a journeyman sheet metal worker on the construction of a new Tennessee penitentiary in Brushy Mountain, Morgan County, Tennessee ("the Project").  (Doc. No. 1, at 3; Doc. No. 79, at 6.)

#### 1.  Job Duties and Supervision

The Project involved the construction of approximately twenty-six buildings.  Defendant employed more than two hundred individuals who were organized into multiple crews that performed work on the different buildings as required.  (Doc. No. 79, at 2-3.)  Sheet metal mechanics, like Plaintiff, were at times transferred to different crews depending on the schedule and work demands; however, Plaintiff alleges Defendant "maintained a Hispanic sheet metal crew to which non-Hispanics generally were not assigned."  (Id. at 3.)

The chain of command "was from the Foremen to the Assistant Superintendents, although the Assistant Superintendents told Plaintiff when to go from one building to the next." (Doc. No. 79, at 7.)  When he began work for Defendant, Plaintiff's immediate supervisor was Assistant Superintendent Richard Camden, and his Foreman was Israel Cantu.  (Id.)  During his tenure with Defendant, Plaintiff was at some point transferred to a different crew, led by Foreman Jimmy Escalante and Assistant Superintendent David Franklin.  (Id. at 8.)  Plaintiff asserts he was transferred back to Camden's crew prior to his termination.  (Id. at 9.)

-2-

In May 2007, Shiner promoted Plaintiff from a sheet metal Laborer-Class A, to a Sheet Metal Mechanic. (Id., at 6-7.) Concurrent with his promotion, Plaintiff received a pay increase to $22 per hour. (Id. at 7.) The Morgan County Project was a "Tennessee prevailing wage scale job," and employees with a particular job classification are to receive the same hourly wage regardless of experience or length of service. (Doc. No. 79, at 3.)

The sheet metal work on the Morgan County Project was divided into two main phases, "rough-in" and "trim-out." (Doc. No. 79, at 8.) Plaintiff's duties consisted primarily of "rough-in" work, which involved hanging and connecting ductwork, although Plaintiff states he also performed "finish" work at times. (Id.)

### 2. Attendance Issues

Before Plaintiff's promotion on May 21, 2007, Plaintiff contends he had missed all or part of four days. (Id. at 9.) Between the date of his promotion and December 21, 2007, Plaintiff missed between seventeen and twenty-five scheduled work days, and arrived late or left early on approximately six additional days. (Id. at 10.) These attendance issues were the subject of a conversation between Camden and Plaintiff in August 2007, during which Camden informed Plaintiff that he needed to arrive at work on time and schedule doctors' appointments for the later part of the day. (Id. at 10.)

On August 16, 2007, Plaintiff and a co-worker left the job site early for lunch. (Id. at 22.) A Foreman, Jimmy Escalante, told the pair they were leaving early and advised them, "[D]on't let it happen again." (Id.) Upon Plaintiff's return to the job site, he received a written warning notice from Escalante. (Id.) Assistant Superintendent Franklin, who was present at the time, told Plaintiff not to worry about the notice. (Id. at 23.)

-3-

Within a few days of this incident, Escalante and several other Hispanic employees left the job site when INS arrived at the location. (Id. at 23.) Escalante told Franklin "his paperwork wasn't right" and "he would be back in a day or so with the right paper work." (Id.) Escalante returned after two days, and did not receive a written reprimand. (Id.) After asking Franklin about this apparent discrepancy, Franklin assured Plaintiff, "Don't worry about the write-up. Don't worry about the write-up. It's nothing. It's a warning. It's nothing." (Id.)

### 3. Layoffs

By November 2007, Shiner informed employees that a layoff would be coming. (Id. at 14.) This announcement was repeated in weekly meetings leading up to the December 21, 2007 layoffs. (Id.) The Project was "winding down," and Defendant needed to "reduce its workforce to fit within its labor projection." (Id. at 14-15.) Defendant claims it began reducing the workforce beginning in August or September by declining to replace employees who left the job, although Plaintiff disputes this claim. (Id. at 15.)

On December 21, 2007, Defendant carried out a formal round of layoffs; Plaintiff was among those terminated in the "overall reduction in workforce." (Id. at 20.) The sheet metal mechanics who were laid off in December were not replaced. (Id. at 21.)

### B. Procedural Background

On or around March 18, 2008, Plaintiff filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission, alleging that Defendant had discriminated against him on the basis of national origin. (Doc. No. 1, at 2.) On August 22, 2008, the EEOC issued a Notice of Right to Sue. (Id. at 3.) Plaintiff filed the instant Complaint on November 20, 2008, alleging employment discrimination under 42. U.S.C. § 2000e-2 (2010).

-4-

## II.    DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### A.    Legal Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides in part that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The Advisory Committee for the Federal Rules has noted that "[t]he very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."

Mere allegations of a factual dispute between the parties are not sufficient to defeat a properly supported summary judgment motion; there must be a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  A genuine issue of material fact is one which, if proven at trial, would result in a reasonable jury finding in favor of the non-moving party.  Id. at 247-48.  The substantive law involved in the case will underscore which facts are material and only disputes over outcome determinative facts will bar a grant of summary judgment.  Id. at 248.

While the moving party bears the initial burden of proof for its motion, the party that opposes the motion has the burden to come forth with sufficient proof to support its claim, particularly when that party has had an opportunity to conduct discovery.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Thus, the non-movant may not rely solely on conclusory allegations, but rather must come forward with affirmative evidence which establishes its claims and raises an issue of genuine material fact.  Id. at 324.  If the evidence is merely colorable, or is

not significantly probative, summary judgment may be granted. <u>Anderson</u>, 477 U.S. at 249-50 (citations omitted). It is true, however, that in ruling on a motion for summary judgment, the court must review the facts and reasonable inferences to be drawn from those facts in the light most favorable to the non-moving party. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 547, 587 (1986). Further, the Court will closely scrutinize the movant's papers while indulgently treating those of the opponent. <u>Bohn Aluminum & Brass Corp. v. Storm King Corp.</u>, 303 F.2d 425, 427 (6th Cir. 1962) (citations omitted).

To determine if a summary judgment motion should be granted, the court should use the standard it would apply to a motion for a directed verdict under Rule 50(a) of the Federal Rules of Civil Procedure. <u>Anderson</u>, 477 U.S. at 250. The court must determine whether a reasonable jury would be able to return a verdict for the non-moving party and if so, the Court must deny summary judgment. <u>Id.</u> at 249. Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" <u>Street v. J.C. Bradford & Co.</u>, 886 F.2d 1472, 1478 (6th Cir. 1989) (citations omitted).

## III. ANALYSIS

When bringing a claim of employment discrimination under Title VII of the Civil Rights Act of 1964, a plaintiff may proceed under either or both of two separate theories: (1) disparate impact; or (2) disparate treatment. <u>Lynch v. Freeman</u>, 817 F.2d 380, 382 (6th Cir. 1987) (citing <u>Rowe v. Cleveland Pneumatic Co.</u>, 690 F.2d 88, 92 (6th Cir. 1982)).

### A.      Disparate Impact

In order to establish an unlawful employment practice based on disparate impact, the Plaintiff must demonstrate that "[Defendant] uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin."  Lewis v. City of Chicago, No. 08-974, 2010 WL 2025206, at *5 (S. Ct. May 24, 2010) (citing 42 U.S.C. § 2000e-2(k)).  Plaintiff need not prove an intent to discriminate; "[d]isparate impact cases typically are concerned with facially neutral practices or standards that in fact work to place a disproportionate burden on a discrete group of employees who are protected under Title VII." Lynch v. Freeman, 817 F.2d 380, 383 (6th Cir. 1987).  The key issue is "whether facially neutral policies and practices had a disparate impact . . . ."  Roberts v. Bailar, 538 F. Supp. 424, 427 (E.D. Tenn. 1980).  If this initial burden is met by Plaintiff, the burden shifts to Defendant to "demonstrate that the challenged practice is job related for the position in question and consistent with business necessity . . . ."  Lewis, 2010 WL 2025206, at *5 (citing 42 U.S.C. § 2000e-2(k)).

Plaintiff does not explicitly allege disparate impact discrimination under Title VII. Defendant asserts that no disparate impact claim was pled.  (Doc. No. 64, at 8.)  The Court finds that Plaintiff fails to meet his initial burden, as he fails to allege any existing neutral practice or standard "work[ing] to place a disproportionate burden" on White sheet metal workers born in America.  In Lewis, for example, the plaintiff challenged a written test requirement for applicants that disparately impacted African American candidates.  Lewis, 2010 WL 2025206, at *1.  Rather than asserting a neutral practice, such as the written test in Lewis, Id. at *1, Plaintiff instead makes a general assertion that Defendant "preferred sheet metal workers who were

-7-

Hispanic"[2] and alleges that workers were selected for termination based on national origin. (Doc. No. 1, at 3-4.)  Because Plaintiff does not allege neutral practices or standards were used to implement this bias, the Court GRANTS Defendant's Motion for Summary Judgment on the claim of disparate impact.

## B.      Disparate Treatment

Plaintiff claims Defendant discriminated against him based on his national origin.  (Doc. No. 1, at 5.)  Specifically, Plaintiff alleges: (1) Plaintiff was paid less than similarly situated employees with Central American (Hispanic) origin; (2) Hispanic employees and Plaintiff committed similar breaches of jobsite policy, yet only Plaintiff was reprimanded; and (3) Plaintiff was terminated, during a workforce reduction, due to his national origin.  (Doc. No. 1, at 4-5; Doc. No. 79, at 15.)

To prevail on a disparate treatment claim, Plaintiff must show intentional discrimination. Lynch, 817 F.2d at 382.  If direct evidence is not available, the Plaintiff can still establish intent to discriminate by proving "actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a discriminatory criterion illegal under [Title VII]."  Id. (internal citations and quotations omitted). The intent that must be shown is "actual motive, not a legal presumption to be drawn from a factual showing of something less than actual motive."  Id. at 383 (citing Pullman-Standard v. Swint, 456 U.S. 273, 287-88 (1982)) (internal quotations omitted).  In McDonnell Douglas Corp.

---

[2] In his filings, Plaintiff in large part assumes that the Hispanic sheet metal mechanics were not born in the United States.  While he has documentation to support his claims in at least some instances, Defendant contends that national origin of several of the workers is unknown. (Doc. No. 83, at 11, 14.)  For simplicity, this Opinion will use "Hispanic" to refer to all Hispanic workers, regardless of their country of origin.

-8-

v. Green, 411 U.S. 792 (1973), the Supreme Court provided four elements a complainant can prove to establish a prima facie case of racial discrimination; the Court noted that the necessary facts "will vary" in Title VII cases. Id. at 802. In general, however, a plaintiff must show:

> (i) that he belongs to a racial minority;
> (ii) that he applied and was qualified for a job for which the employer was seeking applicants;
> (iii) that, despite his qualifications, he was rejected; and
> (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

Id. This test is explained more generally by the Sixth Circuit in Smith v. Allstate Ins. Co., which states the complainant must show that he: (1) belongs to a protected group; (2) was subject to "an adverse employment action;" (3) was otherwise qualified for the position; and (4) similarly situated non-protected employees were treated more favorably. 195 F. App'x 389, 393-94 (6th Cir. 2006).

If Plaintiff establishes a prima facie case of disparate treatment, the Defendant has the burden of "articulat[ing] a legitimate nondiscriminatory reason for its actions." Lynch, 817 F.2d at 383. If Defendant provides this reason, Plaintiff may nonetheless prevail by proving the legitimate reasons offered by Defendant were simply pretexts for discrimination. Id. (citing Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981)).

As an initial matter, Defendant does not contest that Plaintiff suffered an adverse employment action as a result of his termination in conjunction with a workforce reduction. (Doc. No. 79, at 20.) Discharge constitutes an adverse action. Thaddeus-X v. Blatter, 175 F.3d 378, 396 (6th Cir. 1999) (citing Pickering v. Board of Ed. of Tp. High School Dist. 205, Will Cty., 391 U.S. 563 (1968)). However, for the reasons set forth below, the Court finds that there is no genuine issue of material fact regarding Plaintiff's claim of discriminatory treatment and

hereby GRANTS Defendant's Motion for Summary Judgment on this claim.

        **1.**     *There is a genuine issue of material fact regarding whether Plaintiff established direct evidence of discrimination.*

Direct evidence is evidence that, "if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." Jacklyn v. Shering-Plough Healthcare Products Sales Corp., 176 F.3d 921, 926 (6th Cir. 1999). It "must establish not only that the plaintiff's employer was predisposed to discriminate on the basis of [national origin], but also that the employer acted on that predisposition." Dicarlo v. Potter, 358 F.3d 408, 415 (6th Cir. 2004) (quoting Hein v. All America Plywood Co., 232 F.3d 482, 488 (6th Cir.2000)). If credible direct evidence is offered, the defendant must show it would have made the same decision absent the discriminatory motive. Id.

As evidence of direct discrimination, Plaintiff points to a comment allegedly made by Assistant Superintendent Richard Camden. After a meeting with Shiner, Plaintiff claims Camden said that no sheet metal mechanics would be retained in the wake of the coming layoff unless they were from "south of the border." (Doc. No. 79, at 17.) Plaintiff argues Camden acted on this predisposition, claiming that seven of eight sheet metal mechanics classified as "White" were laid off, while only three of eight sheet metal mechanics classified as "Hispanic" were laid off. (Doc. No. 78, at 8.) Plaintiff further contends that, of these three Hispanic workers who were "laid off," two were in fact transferred to another job site. (Doc. No. 78, at 8.) Defendant responds that, after considering all "separations, transfers, and recalls," "four of eight White sheet metal mechanics employed as of December, 2007, were permanently laid off from the Morgan County Project, and four of nine Hispanic sheet metal mechanics employed as of December, 2007, were permanently laid off from the Morgan County Project." (Doc. No. 83, at

-10-

14.)

The national origin of these Hispanic workers is also disputed. Plaintiff contends that Defendant's human resource files demonstrate that eight sheet metal mechanics classified "Hispanic" were born in Mexico. (Doc. No. 78, at 19.) Defendant responds that three of these eight records fail to reflect "Mexico" as the country of birth, claiming "Plaintiff relies solely on the 'Education' section of their applications, but there is no statement in these files that these employees' country of origin is Mexico." (Doc. No. 83, at 11.) Defendant further notes that "Plaintiff provides *no* proof of the national origins of the non-Hispanic employees. (Id.) Finally, Defendant states that only "personnel records available on the jobsite" were referred to by those in charge of layoff determinations; Defendant adds that these records are "limited to employee's application and attendance records and not to any document that might reflect national origin." (Id. at 10-11.) The records cited by Plaintiff, Defendant contends, were part of I-9 authorization to work documents and were kept in Defendant's Nashville office, not at the jobsite. (Doc. No. 85, at 5.)

Further, while Plaintiff admits that Camden was not the "final decision maker," he characterizes him as a primary decision maker. (Doc. No. 78, at 16.) Defendant contends that Camden was not involved in "the discussions or decision to include Plaintiff in the layoff," and therefore, Camden's statement is immaterial. (Doc. No. 83, at 9.)

The Sixth Circuit has held that a "statement by an intermediate level management official is not indicative of discrimination when the ultimate decision to discharge is made by an upper level official." Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 354 (6th Cir. 1998) (quoting McDonald v. Union Camp Corp., 898 F.2d 1155, 1161 (6th Cir.1990)). However,

-11-

remarks by those who "played a meaningful role in the decision to terminate" are relevant.  Id. at 354-55.  According to Ercegovich, the question for this Court is whether a reasonable jury could conclude Camden "was in a position to influence" Shiner's decision.  Id. at 355; see Anderson, 477 U.S. at 250.  In order to prove there is a genuine issue for trial, the non-moving party must come forth with sufficient proof, and not rely solely on conclusory allegations.  Celotex, 477 U.S. at 323-24.

Here, Camden stated in a declaration that he was "not involved in the decisions" involved in the December 2007 reduction in force, saying he had "no discussions" with Shiner, Franklin or Russell, and "did not recommend Plaintiff . . . or anyone else for inclusion" in the layoff. (Doc. No. 84, at 2.)  Camden also denies making the "south of the border" statement alleged by Plaintiff.  (Id.)  Shiner's declaration supports Camden's claims, as Shiner states he chose to include Plaintiff in the layoff "based on my own assessment of the overall circumstances and based on the recommendations and input of David Franklin and Tom Russell."  (Doc. No. 62, at 3.)  Shiner added that "[n]either Richard Camden nor any other supervisor, other than Franklin and Russell, participated in the discussions regarding the decision to lay off Plaintiff."  (Id.) Franklin confirms these accounts in his declaration.  (Doc. No. 63, at 2.)  Considering the sworn testimony of Camden, Franklin and Shiner that Camden did not participate in the decision to layoff Plaintiff (Doc. No. 83, at 9), as well as Plaintiff's inability to bring forth evidence showing that national origin was considered in the layoff decisions, or that a disproportionate number of workers born in the United States were fired, a reasonable jury could find that Plaintiff failed to establish direct evidence of discrimination.  However, because a court must consider the evidence in a light most favorable to the non-moving party, Matsushita Elec. Indus. Co., 475

-12-

U.S. at 587, and in light of Plaintiff's contention that Camden recommended that Plaintiff be included in the layoff, this Court finds that there is a genuine issue of material fact as to whether direct evidence of discrimination exists.  However, Defendant was able to show it would have made the same decision absent discrimination.[3]

## 2.     *Plaintiff fails to establish indirect evidence of discrimination.*

Plaintiff does not provide indirect evidence of discrimination, as he fails to show that Defendant is the unusual employer who discriminates against the majority, and also fails to identify similarly situated individuals who were treated more favorably.

### a.     *Plaintiff fails to identify background circumstances showing Defendant is the unusual employer who discriminates against the majority.*

When making a reverse discrimination claim, as in the instant case, Plaintiff must demonstrate under the first prong, "background circumstances [to] support the suspicion that the defendant is that unusual employer who discriminates against the majority."  Zambetti v. Cuyahoga Community College, 314 F.3d 249, 255 (6th Cir. 2002) (citation omitted).  These background circumstances are necessary, as "the presumption that the circumstances which normally make out a prima facie case are indicative of discrimination is not available" in a reverse discrimination case.  Jamison v. Storer Broadcasting Co., Nos. 83-1170, 83-1244, 1987 WL 44901, at *3 (6th Cir. Sept. 30, 1987) (quoting Parker v. Baltimore & Ohio R.R. Co., 652 F.2d 1012, 1017 (D.C. Cir. 1981)).  For this reason, "a party seeking to establish a prima facie case of reverse discrimination carries a somewhat heavier burden that a plaintiff who is a member of a protected group."  Id.  The "background circumstances" requirement could be

---

[3] See infra Part III.B.3.

-13-

satisfied if a plaintiff convinced the court that "evidence of [defendant's] unlawful consideration of race as a factor in hiring in the past justifies a suspicion that incidents of capricious discrimination against whites because of their race may be likely . . . ." Id. (quoting Parker, 652 F.2d at 1018).

Courts in the past have considered a variety of factors in determining whether background circumstances were established, including but not limited to: (1) whether the employer was a member of the same minority race as the employees he was promoting, Morris v. Family Dollar Stores of Ohio, Inc., 320 F. App'x 330, 340 (6th Cir. 2009) (citing Zambetti, 314 F.3d at 257) (sufficient to establish background circumstances); (2) whether an adverse employment decision was made by a member of a racial minority, Arendale v. City of Memphis, 519 F.3d 587, 603 (6th Cir. 2008) (citing Zambetti, 314 F.3d at 257) (sufficient to establish background circumstances); (3) whether a majority of employees were white, Murray v. Thistledown Racing Club, Inc., 770 F.2d 63, 68 (6th Cir. 1985) (where majority of employees were white, court found declined to find background circumstances existed); and (4) whether a minority superior replaced the plaintiff with a member of the same minority as the superior, Morris, 320 F. App'x at 339 (sufficient to establish background circumstances).

Here, Plaintiff fails to demonstrate background circumstances to support his contention that the Defendant is the "unusual employer" who discriminates against the majority, as: (1) Plaintiff was hired and fired by an individual of the same national origin as Plaintiff; and (2) Plaintiff admitted there was an equal number of White and Hispanic sheet metal workers prior to the layoff. Moreover, Plaintiff did not provide evidence for his claim that Hispanic employees were more favorably treated in regards to overtime opportunities, attendance policies, record-

keeping, or payment. Therefore, Plaintiff's claim for disparate treatment fails. See Zambetti, 314 F.3d at 255.

> i. An individual who is a member of the same protected class as Plaintiff hired and fired Plaintiff in a short period of time.

The Sixth Circuit states that where an employee is hired and fired within a short time by the same individual, there exists a "strong inference . . . that discrimination was not a determining factor for the adverse action taken by the employer." Buehrmaster v. Overnite Trasp Co., 61 F.3d 461, 463 (6th Cir. 1995). Plaintiff was hired, promoted, and fired by Superintendent Scott Shiner, a White male born in the United States. (Doc. No. 64, at 13.) The case is thus distinct from the principle espoused in Arendale, 519 F.3d at 603, where the court said an adverse employment decision made by a member of a racial minority was sufficient to establish background circumstances.

The facts of the instant case in many ways resemble the facts in Lowe v. J.B. Hunt Transport, Inc. 963 F.2d 173, 175 (8th Cir. 1992). In Lowe, the plaintiff (Lowe) was nearly fifty-two years old at the time of his hiring and almost fifty-four when he was discharged. Id. at 173. Lowe was fired by the same officials who hired him; purportedly because of "the falsification of a petty-cash report." Id. While Lowe alleged that age discrimination provided the true motive for his termination, the Eighth Circuit stated that it would be "incredible" to believe that a company official, after hiring a fifty-one year old two years earlier would have "developed an aversion" to older individuals in such a short time. Id. at 175. In the instant case, Shiner's discriminatory behavior against workers born in the United States origin would have developed over a nine month period. In short, Shiner's decision to fire Plaintiff fails to

-15-

demonstrate national origin discrimination.

        ii.      <u>Plaintiff claimed there was an equal number of White and Hispanic sheet metal workers prior to the layoff.</u>

Plaintiff fails to establish that a majority of workers employed by Defendant were not born in the United States. First, Plaintiff admits that prior to the layoffs on December 21, 2007, there were an even number of both White and Hispanic Sheet Metal Mechanics. (Doc. No. 78, at 1). While Defendant claims there were in fact nine Hispanic workers and eight White workers in the group at issue (Doc. No. 83, at 14), Defendant notes that the national origin of several of these workers is unknown. (Id. at 11.) Additionally, Defendant states that of the eighty-six total employees on the Project, fifty-eight were White.[4] (Doc. No. 85, at 31.) Because a majority of Defendant's employees working on the project were White, these facts fail to establish the necessary background circumstances. See <u>Murray</u>, 770 F.2d at 68.

        iii.     <u>Past employment decisions by Defendant fail to demonstrate instances of national origin discrimination.</u>

While Plaintiff alleges that he might have been discriminated against in the distribution of overtime shifts, claiming that "most of it was sent out to the [Hispanic] crew" (Doc. No. 85, at 41), Plaintiff failed to point to any specific instances of such unequal distribution. In fact, he testified he was allowed to work overtime each time he asked for it. (<u>Id.</u>) In the absence of any showing that he was denied overtime opportunities, or that Hispanic workers were given those opportunities, Plaintiff's argument must fail. <u>Montgomery v. Honda of America Mfg., Inc.</u>, 47 F. App'x. 342, 345 (6th Cir. 2002) (stating that in the "absence of some evidence that he was

---

   [4] Plaintiff claims the only relevant workforce was sheet metal mechanics. (Doc. No. 85, at 31.)

denied the opportunity to work overtime," there was no "genuine issue of material fact" on the plaintiff's theory of discrimination).

Plaintiff also alleges he was disciplined differently than Hispanic workers for attendance related issues,[5] but the facts demonstrate the situations are not comparable, nor were the employees in question similarly situated.[6]  When Plaintiff left early for lunch one day, he received a written warning; however, his pay was not docked.  (Doc. No. 79, at 22.)  In contrast, when Hispanic employees, including Jimmy Escalante, left the job site in connection with an INS visit, their pay was docked for the missed time though they did not receive written reprimands.  (Id. at 23.)  However, Plaintiff admits that when he left early on occasion, Defendant similarly docked his pay without issuing a written reprimand.  (Doc. No. 85, at 36.)  Moreover, Assistant Superintendent Franklin, who was present at the time Plaintiff received the warning, told Plaintiff not to worry about the notice.  (Doc. No. 79, at 22-23.)  He later assured Plaintiff again, saying, "[d]on't worry about the write-up.  Don't worry about the write-up.  It's nothing.  It's a warning.  It's nothing."  (Id. at 23.)  Both parties agree Shiner did not consider this warning in his decision to include Plaintiff in the layoff.  (Doc. No. 85, at 36.)  This incident fails to demonstrate impermissible consideration of national origin in employment decisions or even to reveal inconsistent treatment of similarly situated employees.[7]

---

[5] See supra pp. 3-4.

[6] While the similarly situated employee prong is separate from this examination, see infra Part III.B.2.b for more discussion on similarly situated employees, the failure of Plaintiff to name a similarly situated employee is relevant to, if not determinative of, background circumstances that would indicate Defendant is an employee who discriminates against the majority.

[7] See infra Part III.B.2.b for more discussion on similarly situated employees.

Plaintiff points to Defendant's willingness to allow Hispanic employees to "change identities," as further evidence that Defendant treated Hispanic employees more favorably. Plaintiff points to a situation involving Pedro Dominguez Tercero as proof. (Doc. No. 85, at 37-38.) Defendant replies that Tercero was advised of an inconsistency in his information, and after revealing his real name was Freddy Gonzalez, Gonzalez/Tercero resolved the discrepancy and was allowed to return to work. (Doc. No. 85, at 38.) Defendant argues this information is unrelated to the layoffs and Plaintiff has failed to offer evidence that these circumstances were related to his termination, or that Gonzalez/Tercero was similarly situated to Plaintiff. (Doc. No. 85, at 38.) Because Plaintiff fails to assert that White employees were denied the opportunity, in similar situations, to correct discrepancies in their information, this assertion of fact is inapposite.

Plaintiff also claims that Defendant revealed its preference for Hispanic workers by hiring three additional Hispanic sheet metal mechanics between September and October. (Doc. No. 79, at 15.) Plaintiff notes that these hires took place after Defendant had allegedly begun reducing its workforce. (Id.) Defendant admits these hires, but adds that it also employed three White sheet metal mechanics in September and October. (Doc. No. 83, at 17.) Defendant also explains it *generally* stopped replacing employees who left the job, and states Plaintiff fails to offer evidence that the individuals were hired to replace employees who left the job, nor does Plaintiff cite "any reason other than a need to complete a sufficient amount of the sheet metal work in time for the planned reduction in force." (Id.) Because Defendant hired an equal number of White and Hispanic sheet metal mechanics during this period, and because Plaintiff fails to

-18-

provide any evidence showing any discrepancy in the percentage of applicants who were hired,[8] Plaintiff again fails to demonstrate impermissible consideration of national origin.

Finally, Plaintiff alleges that a similarly situated employee born in Mexico was paid more than Plaintiff. (Doc. No. 78, at 20.) This contention is not supported by the facts. When Plaintiff began working for Defendant, he was classified as a sheet metal Laborer-Class A, and earned $16.36 per hour. (Doc. No. 79, at 6.) In May 2007, Superintendent Scott Shiner promoted Plaintiff to a Sheet Metal Mechanic, and Plaintiff received a pay increase to $22 per hour. (Id. at 7.) Plaintiff states that an employee born in Mexico, Pedro D. Tercero, received $23 per hour while under the same classification as Plaintiff. (Id.) Defendant explains that this is due to Tercero's designation as a *Lead* Sheet Metal Mechanic (Doc. No. 83, at 16), and notes that Wayne Lambert, a White Lead Sheet Metal Mechanic, received $24 per hour. (Id.) Because Plaintiff was not a *Lead* Sheet Metal Mechanic, this disparity in pay fails to show an instance of national origin discrimination.

> b. *Plaintiff was not similarly situated to the employees who were retained.*

Even if Plaintiff had satisfied the first prong of Smith, Plaintiff's claim would present no genuine issue of material fact, because he fails to satisfy the remaining prongs of Smith. The Court will address the third and fourth prongs of Smith—whether Plaintiff is otherwise qualified for the position and whether similarly situated employees of a different national origin were treated more favorably—together in this section, as Plaintiff's job qualifications relate closely to the inquiry of whether he properly identifies similarly situated individuals who were treated

---

[8] For instance, Plaintiff fails to offer proof that, of fifty applicants for the six positions, forty-five applicants were White and five were Hispanic.

more favorably.  195 F. App'x at 393-94.   In short, Plaintiff failed to identify other employees with equally poor attendance records who were nonetheless retained during the workforce reduction.

During the last seven months of Plaintiff's employment with Defendant, Plaintiff missed between seventeen and twenty-five scheduled work days,[9] and arrived late or left early on approximately six additional days.  (Doc. No. 79, at 10.)  Defendant claims that, in his deposition, "Plaintiff admitted his absences were a reasonable factor for [Defendant] to consider in evaluating his performance."  (Id. at 12; Doc. No. 60-1, at 190.)  Plaintiff disputes the relevance of this statement, saying that because "the questioning was based on the [false] assumption that plaintiff was scheduled to work the week ending June 15," the reference failed to support Defendant's assertion.  (Doc. No. 79, at 13.)

Plaintiff appears to contend that employee Victor Campuzano, Jr., is similarly situated to Plaintiff, by virtue of Campuzano's attendance record.  Campuzano, born in Mexico, was hired as a sheet metal foreman on April 9, 2007.  (Id. at 13.)  Records show that on May 7, 2007, Campuzano called to inform Defendant he was in Texas[10] and would arrive the following day. (Id.)  A separation notice dated June 15, 2007, states that Campuzano resigned and returned to Texas.  (Doc. No. 79-3, at 24.)  Campuzano was rehired and returned to work on August 31,

_____

[9] The discrepancy is, in part, because Plaintiff claims Defendant wrongly counted five days from the week ending June 15; Plaintiff alleges he was not scheduled to work that week. (Doc. No. 85, at 12.)  Defendant replies that this contention is inconsistent with Defendant's record-keeping process.  (Id. at 13.)  Defendant also states that Plaintiff fails to offer any evidence in support of his claim that the other three days in question are unsupported by Defendant's records.  (Id. at 12.)

[10] It is unclear why Campuzano was in Texas.

-20-

2007.  (Id. at 22.)  Plaintiff draws attention to the fact that no other documents in Campuzano's file discuss his "trip to Texas," while documents in Plaintiff's file show when Plaintiff was not present for a shift."  (Doc. No. 79, at 13-14.)  Defendant states that Plaintiff "does not allege that Campuzano's attendance was equal to or worse than his own," and "disregard[s] undisputed evidence that relevant attendance records were kept for absences or missed work on 'scheduled' work days, not for pre-planned and pre-approved absences."  (Doc. No. 85, at 19.)  Defendant further asserts that Plaintiff provided no evidence suggesting Campuzano's time in Texas was not pre-planned and pre-approved, saying Plaintiff only "inappropriately assumes and speculates . . . which is not sufficient to create a genuine issue of material fact."  (Id.)  Defendant also states that from September 1, 2007 to December 21, 2007, Campuzano worked a full schedule each week, and often worked overtime, while Plaintiff missed eight scheduled work days and was tardy or left early on three additional days.  (Id. at 19-20.)  Plaintiff denies he missed eight days of work during this time, but Defendant notes attendance records support Defendant's assertion, and Plaintiff offers no specific evidence to the contrary.  (Doc. No. 85, at 14.)  The Court agrees with Defendant that Plaintiff fails to demonstrate Campuzano is similarly situated, as no evidence was offered to show Campuzano's time in Texas was not approved.  Because Plaintiff fails to identify a similarly situated employee, Plaintiff's claim fails.

### 3.    *Defendant offers a nondiscriminatory reason for Plaintiff's termination, and Plaintiff fails to prove this is a pretext for discrimination.*

Plaintiff also fails to prove Defendant's nondiscriminatory reason for Plaintiff's termination was pretext.  Even if a plaintiff carries his initial burden of demonstrating discrimination—through direct or indirect evidence—the matter is not at an end.  If a plaintiff offers credible evidence of direct discrimination, a defendant may put forth evidence that it

-21-

would have made the same decision absent the discriminatory motive.  Dicarlo, 358 F.3d at 415

(quoting Hein, 232 F.3d at 488).  Similarly, when a plaintiff establishes a prima facie case of

disparate treatment through indirect evidence, a defendant has the opportunity to "articulate a

legitimate nondiscriminatory reason for its actions."  Lynch, 817 F.2d at 383.  If a defendant

articulates such a reason, the plaintiff needs to demonstrate that the reason offered was simply a

pretext for discrimination.  Id. (citing Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248,

252-53 (1981)).  Moreover, as other Circuits have held, the court's role is not to "tell employers

what the requirements for a job must be."  Schaffner v. Glencoe Park Dist., 256 F.3d 616, 621

(7th Cir. 2001) (internal quotations and citation omitted).  Here, Defendant provides a

nondiscriminatory reason for its actions: it states that Plaintiff was laid off before other

employees because of his poor attendance record.  Plaintiff fails to demonstrate this is a pretext.

> a.      *Defendant states Plaintiff was fired for poor attendance and his*
> *unwillingness to transfer to a new site, combined with a declining*
> *need for the work Plaintiff performed.*

Defendant asserts it included Plaintiff in the layoff due to his poor attendance, as well as

his lack of interest in transferring to a different work site, and the declining need for the type of

work performed by the Plaintiff.  (Doc. No. 64, at 22-23.)

Poor attendance provides a legitimate reason for Defendant to discharge Plaintiff.  See

Peck v. Elyria Foundry Co., 347 F. App'x 139, 146 (6th Cir. 2009) ("poor attendance record is a

legitimate nondiscriminatory reason to exclude an applicant for consideration for any position");

Cambell v. International Paper Co., 138 F. App'x 794, 796 (6th Cir. 2005) (poor attendance was

a legitimate reason not to rehire employee); Harris v. Circuit Court, Clerk's Office, Metro.

Nashville, 21 F. App'x 431 (6th Cir. 2001) (poor attendance was a legitimate reason to terminate

employee).

A willingness to transfer was also considered by Defendant during deliberations regarding who to include in the layoff. (Doc. No. 79, at 16.) Both parties acknowledge that Shiner announced other jobs might be available for employees who were interested in traveling, and asked employees to inform him of their interest. Plaintiff admits he "never informed Shiner he would be interested in work at other job site locations." (Id., at 15.) Indeed, Plaintiff concedes he was unwilling to work more than fifty to sixty miles from his home. (Id. at 16.)

Defendant states that another factor that informed Defendant's decision to layoff Plaintiff was the declining need for "rough-in" work. (Id. at 19.) While Plaintiff admits only a small number of buildings were still having "duct work" done, Plaintiff claims substituting "rough-in" for "duct work" is a material distortion. (Id., at 19-20.) However, in his deposition testimony, Plaintiff describes his duties as consisting of "[hanging] ductwork, just reading the blueprints, finding out where it goes, putting it together, modifying it if it needed it." (Doc. No. 60-1, at 24.) In regards to other "rough-in" work, such as "grill work" and "punch-out" work, Plaintiff describes his participation as minimal. (Id. at 25.)

>    b.    *Plaintiff fails to show Defendant's reasons are a pretext for discrimination.*

Plaintiff disputes Defendant's proffered reasons for his termination, but is unsuccessful in his attempts to demonstrate they are a pretext. Plaintiff fails to show that an alleged discriminatory statement by Camden was significant, or that his absences, lack of work and unwillingness to transfer were not the motivating factors behind his termination.

Plaintiff's principal argument in attempting to show Defendant's justification was a pretext for discrimination revolves around a comment made by Camden, who allegedly said,

-23-

after a meeting with Shiner, that no sheet metal mechanics would be retained unless they were from "south of the border."[11]  (Id.)  Based on this statement, and the fact that all three members of Plaintiff's crew—who were all born in the United States—were laid off, Plaintiff denies that the decisions were made based on the factors discussed by Shiner.  (Doc. No. 80, at 3; Doc. No. 79, at 16-17.)  Defendant contends that the recommendation to layoff Plaintiff came from Franklin and one of his Foremen, Tom Russell.  (Id. at 17-18.)  However, Plaintiff maintains he was at that time on a crew supervised by Foreman Israel Cantu and Assistant Superintendent Camden, and any discussions or recommendations regarding Plaintiff's status would have involved Cantu and Camden, not Franklin and Russell.  (Id. at 17-18.)  Defendant states that even if Plaintiff was supervised by Cantu and Camden at the time of the layoffs, this does not contradict Defendant's assertion that Franklin and Russell discussed which individuals, on various crews, would be recommended for layoff.  (Id. at 25-26.)  Plaintiff's history of poor attendance alone was sufficient reason to include him in the layoff.  Harris, 21 F. App'x at 431.  Considered in conjunction with the reduction in workforce, the absence of any past employment actions demonstrating the Defendant had a habit of discriminating against the majority, and the sworn testimony of Camden, Franklin and Shiner that Camden did not participate in the decision to layoff Plaintiff (Doc. No. 83, at 9), no reasonable jury could conclude that Camden shaped Shiner's decision to terminate Plaintiff's employment, and there is thus no "genuine issue for trial."  Street, 886 F.2d at 1478.

Next, Plaintiff failed to demonstrate that any other sheet metal mechanic had a worse attendance record, or that Plaintiff's attendance issues were reasonable.  (Doc. No. 85, at 13.)

---

[11]See infra pp. 10-12.

He nonetheless claims that his attendance record was simply a pretext for discrimination, stating that Defendant "apparently did not consider the absences to be significant while [Plaintiff] was an employee" and noting that he was not written up for his absences. (Doc. No. 78, at 17.) Plaintiff further alleges that a letter from Defendant, dated August 26, 2008, and unconditionally offering Plaintiff employment at several jobsites demonstrates his poor attendance did not make him unsuitable for employment. (Id.)

While Plaintiff notes that Defendant used a three-strike policy for dealing with performance issues, and states Plaintiff never received a single write-up for absences from work (Doc. No. 78, at 17), Plaintiff's arguments fail to appropriately acknowledge that his termination was in conjunction with a reduction in the workforce. Because Plaintiff's termination was triggered by work reduction layoffs, his poor attendance provides a legitimate nondiscriminatory reason for Defendant to include Plaintiff in the reduction. See Bell v. Prefix, Inc., 321 F. App'x 423, 429 (2009) (a "slow worker with a lackadaisical attitude" was properly included in a reduction in force).

Plaintiff also contends that Defendant's offer in August 2008 to hire Plaintiff at other worksites reveals his competence. However, Defendant's willingness to rehire Plaintiff at a later date is not inconsistent with its stated reason for Plaintiff's termination. What may be acceptable to a particular employer may still provide a nondiscriminatory reason to terminate an employee in conjunction with a reduction in workforce.

Finally, Plaintiff questions whether Defendant employed the factors it cites, noting that his entire crew was laid off. (Doc. No. 79, at 16-17.) However, the fact that Plaintiff's crew of three was laid off in its entirety does not undermine Defendant's contention that the process was

individualized.  (Id.)

**IV.**     **CONCLUSION**

Plaintiff has not demonstrated that a genuine issue of material fact exists regarding any of his claims in the instant matter.  For the reasons set forth above, the Court **GRANTS** Defendant's Motion for Summary Judgment (Doc. No. 59) and **DISMISSES** Plaintiff's claims of discrimination based on national origin under Title VII in their entirety.  Additionally, Plaintiff's Motion to Allow Late-Filed Documents (Doc. No. 81) is hereby **GRANTED**.

It is so ORDERED.

Entered this the __28th_____ day of June, 2010.


JOHN T. NIXON, SENIOR JUDGE
UNITED STATES DISTRICT COURT